Gale Carlisle Huber and Mary Lou Huber v. Commissioner.
Huber v. Comm'r
Docket No. 5067-68. United States Tax Court
T.C. Memo 1970-219; 1970 Tax Ct. Memo LEXIS 139; 29 T.C.M. (CCH) 958; T.C.M. (RIA) 70219; July 29, 1970, Filed *139 Held, fee expended in order to secure employment is deductible as an ordinary and necessary business expense within the meaning of Sec. 162, I.R.C. 1954. David J. Primuth [Dec. 29,985], 54 T.C. 374 (1970). R. K. Wilson, for the petitioners. Rodney G. Haworth, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The respondent determined a deficiency of $563.49 in the petitioners' Federal income tax for the taxable year 1966. The sole issue for decision is whether fees paid by petitioner, *140 Gale Carlisle Huber, to Frederick Chusid & Company for assistance in seeking new employment are deductible as ordinary and necessary business expenses under section 162, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts were stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioners, Gale Carlisle Huber and Mary Lou Huber (Mary Lou is involved herein solely by reason of filing a joint return and therefore the designation petitioner will refer only to Gale) resided at Piqua, Ohio, at the time their petition was filed. They filed their joint Federal income tax return for 1966 with the district director of internal revenue at Cincinnati, Ohio. Prior to May 18, 1966, the petitioner was employed by Inland Homes Corporation (hereinafter referred to as Inland) in Piqua, Ohio, as director of sales and marketing. His basis duties consisted of the recruiting, hiring and training of salesmen as well as the performance of various management duties. Prior to his employment with Inland the petitioner *141 had been employed in the sales and marketing field for approximately 10 to 15 years. Petitioner felt that Inland was not going to conduct a successful operation and that, accordingly, he had a limited future with the company. Therefore, he contacted Frederick Chusid & Company (hereinafter referred to as Chusid) with a view towards securing other employment. Chusid, though not claiming to be an employment agency, holds itself out as "World's Largest Consultants in Executive Search and Career Advancement." In its advertising materials Chusid terms itself "Management Psychologists." Although he was mistaken in his belief that Chusid was a licensed employment agency, petitioner had become familiar with the Chusid organization through dealings he had had with the company in his capacity as recruiter of sales personnel. His past experience with Chusid convinced the petitioner that Chusid presented its clients in an effective manner which was superior to that of other employment services. After informing Chusid that he was interested in securing new employment in the same field of sales and marketing, on May 18, 1966, petitioner entered into a contract for Chusid's services. The contract *142 provided for payment by the petitioner of $2,375, or $2,256.25 if the fee were paid in full by June 15, 1966, plus certain out-of-pocket expenses. The fee was payable in all events although petitioner did not realize this fact. However, a representative of Chusid told him that there was a good possibility that he would obtain new employment through their efforts. According to the terms of the contract Chusid agreed to provide "consulting services and direct assistance" for a period of 8 months, beginning with the date of the 959 contract. On May 18, 1966, petitioner made payment of $500 and on June 15, 1966, he paid the remainder of $1,756.25 to Chusid. On July 14, 1966, petitioner paid $394.98 to Executive Advertising Service to cover the cost of envelopes, letterheads, resumes and stamps for mailing. The aforementioned contract of May 18, 1966, set forth the various services that Chusid had agreed to perform. These were as follows: (1) assignment of the client's case to various staff members, such as a "supervising psychologist," a "counseling psychologist," promotional specialists, writers, financial advisers and researchers; (2) research into the client's background, abilities *143 and personality; (3) evaluation of the client by the psychological staff; (4) counseling; (5) career assessment; (6) evaluation of opportunities; (7) career planning; (8) establishment of a plan of action aimed toward realization of goals; (9) development of a "marketing image;" (10) staff assistance in the preparation of marketing materials; (11) aid in improving the client's presentation techniques; (12) endorsement of the client by Chusid; (13) facilitation of a broad marketing program; (14) advice as to market conditions; (15) investigation of opportunities; (16) aid in negotiations; (17) assessment of offers; and (18) "postcareer move counseling." Approximately one week after execution of the above-described contract the petitioner was called to Chusid's office in Chicago, Illinois. At this time he submitted to about 2 hours of psychological testing. After evaluation of the tests the petitioner was assigned to a counselor who explained Chusid's techniques. The petitioner was informed that the job market was to be "saturated" with resumes prepared from information that the petitioner was to furnish. He was also told that interviews would be arranged by Chusid with those prospective *144 employers who responded favorably. Approximately one week after the petitioner's interview at Chusid's office he began to receive copies of letters and resumes that Chusid had sent out on his behalf. Thereafter petitioner received from Chusid letters which had been written by prospective employers. Petitioner then contacted these prospective employers in order to arrange interviews. The petitioner received approximately 50 letters in this manner. Of these 50, petitioner contacted 12 and of the number he contacted 2 interviews were completed. After each contact that petitioner made with a prospective employer he would report what had transpired to a Chusid representative. This representative would then counsel petitioner as to suggested techniques and offer evaluations of any possibilities. One of the methods that Chusid suggested to the petitioner was that he read newspaper help wanted advertisements; if something interested him he was to report it to Chusid. In this way, while at the library, the petitioner saw an advertisement of Pitney-Bowes, Inc. for salesmen of office copier equipment. This advertisement would not have normally interested the petitioner because he was seeking *145 employment at the managerial level. However, Chusid had told him to notify them if he saw anything of interest and accordingly, because of this admonition, he questioned Chusid about the possibility of this opportunity. Chusid advised the petitioner to contact Pitney-Bowes because it was felt that the company might require management personnel. Since petitioner had been employed with the Xerox Corporation in the past, Pitney-Bowes evinced interest in response to a letter sent by him and to a resume which had been prepared by Chusid. Subsequently the petitioner was invited to attend an interview at Pitney-Bowes' offices in Stamford, Connecticut. Petitioner had at least two further interviews with Pitney-Bowes' representatives. After each of the three interviews that petitioner attended he consulted with his Chusid counselor, Jim Jones. Petitioner used the techniques he learned from Chusid in his interviews and negotiations with Pitney-Bowes. Thereafter, Pitney-Bowes offered the petitioner employment. Approximately 2 1/2 months prior to this time the petitioner had lost his job with Inland due to a general cutback in personnel. Initially, petitioner was employed to aid in the development *146 of Pitney-Bowes' introductory copier market in Chicago. In Chicago he initiated a program for Pitney-Bowes; training, marketing, developing, and doing all that was necessary to organize the showing of the corporation's new product. Prior to this, when petitioner was first offered the job at Pitney-Bowes he demurred because the compensation was not what he had received in the past. However, he accepted the job with the understanding that he would soon be promoted to zone manager at a higher level of remuneration. 960 When this promotion did not materialize, after the Chicago exhibition, the petitioner resigned from Pitney-Bowes in December of 1966. [2] The petitioner's employment with Pitney-Bowes entailed primarily the same responsibilities that he had had at Inland. Further, employment that the petitioner obtained subsequent to leaving Pitney-Bowes was of the same nature. *147 The petitioner deducted $2,651 [3] on his Federal income tax return for 1966 as "Employment Fees." In his statutory notice the respondent disallowed the deduction in full, stating: (a) It is determined that fees and expenses paid for seeking employment are not deductible under sections 162 or 212 of the Coke. Ultimate Findings of Fact 1. Petitioner was in the trade or business of being a director of sales and marketing. 2. Chusid was of material assistance in the petitioner's efforts to secure employment. Opinion This is another of that recent spate of cases concerning the deductibility of fees paid to an employment service, i. e., Frederick Chusid & Company. See David J. Primuth, 54 T.C. 374 (1970), on appeal (C.A. 7, May 28, 1970); Guy R. Motto, 54 T.C. 558 (1970), on appeal(C.A. 7, July 15, 1970); kenneth R. Kenfield, 54 T.C. 1197 (June 3, 1970). The issue in each of these cases, as well as in the case at bar, is whether the petitioner was entitled to deduct fees *148 paid to Chusid [4] for its assistance in securing new employment under section 162(a).
Section 162(a) provides as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. We hold that the amount of $2,651.23 paid by the petitioner as employment fees and related expenditures was incurred in carrying on his trade or business of being a director of sales and marketing. In view of our holdings in Primuth, Motto, and Kenfield, it seems well settled that a taxpayer may be in the trade or business of being an employee. The fact that in the instant case the taxpayer was a director of sales and marketing rather than an engineer as in Kenfield and Motto or a corporate executive as in Primuth does not, of course, serve to distinguish those cases. In Harold A. Christensen, 17 T.C. 1456 (1952), the taxpayer was in the trade or business *149 of being a field manager for sales; an occupation markedly similar to that of the petitioner. Another important consideration in our decision that the petitioner was in the trade or business of being a director of sales and marketing is the fact that he has utilized the same basic skills for approximately 15 years. Harold Haft, 40 T.C. 2, 5 (1963) (In this case the taxpayer was also employed in the sales field.) In his employment with Inland and then in his employment with Pitney-Bowes the petitioner was engaged in the same trade or business. The basic skills that he used for Pitney-Bowes were neither higher nor greater in function or degree than those he used for Inland. [5]
We would note here that we deem it of no importance that the petitioner suffered a hiatus in employment from the time he left Inland until the time he accepted the Pitney-Bowes' offer. In Harold Haft, supra, at 6, we stated that a costume jewelry salesman who had been so employed for 25 years "did not cease to be in the costume jewelry business" merely because *150 he was temporarily unemployed. See also Furner v. Commissioner, 393 F. 2d 292 (C.A. 7, 1968), reversing 47 T.C. 165 (1966); David J. Primuth, supra, at 378. In our findings of fact we stated that the petitioner's new employment with 961 Pitney-Bowes offered less in the way of remuneration than had his old job with Inland. Although an increment in compensation was a factor to be considered in Kenneth R. Kenfield, supra, at -, such an increase is, of course, not essential to the allowance of a deduction. Furthermore, as we stated in our findings of fact, the petitioner was given to understand by Pitney-Bowes that he would soon be earning more. Finally, just prior to his acceptance of Pitney-Bowes' offer the petitioner was unemployed; i. e., he was in the trade or business of being a director of sales and marketing, but he was earning nothing. His employment with Pitney-Bowes, needless to say, substantially increased the income from his trade or business. Having reached the conclusion that petitioner expended funds in furtherance of his trade or business of being a director of sales and marketing the authority represented by *151 Primuth, Motto, and Kenfield is dispositive. Risking redundancy we would state as we did in Primuth at 379: Once we have made our decision that the petitioner was carrying on a trade or business of being a corporate executive, the problem presented here virtually dissolves for it is difficult to think of a purer business expense than one incurred to permit such an individual to continue to carry on that very trade or business - albeit with a different corporate employer. In Morris v. Commissioner, 423 F. 2d 611, 612 (C.A. 9, 1970), affirming a Memorandum Opinion of this Court, the Court of Appeals held that fees paid to Chusid were not deductible when "the firm was in no way instrumental in obtaining the job that petitioner ultimately undertook." In the instant case, however, we find that Chusid was of material assistance to the petitioner in his efforts to secure new employment. Allowance of the deduction cannot require that the employment service procure the new employment singlehandedly. All the service can do is present its client in a favorable way, and instruct him in the most effective methods of job seeking. Generally, the rest depends on the impression that *152 the prospective employee gives by his past record of employment and demeanor in personal interviews. In the instant case Chusid prepared the petitioner's resume, counselled him on many occasions and, indeed, caused him to contact his ultimate employer. [6] "[Petitioner] with the assistance of Chusid * * * actually obtained a new job with a new employer which he in fact accepted." Kenneth R. Kenfield, supra, at -.
On brief *153 the respondent devotes a considerable portion of his argument to support of Rev. Rul. 60-223, 1960-1 C.B. 57. We have dwelled at length on this somewhat ambiguous ruling in David J. Primuth, supra, at 380, and it would be fruitless to reiterate our comments here. It suffices to say that our opinion concerning this revenue ruling remains constant. Relying on the triumvirate of Primuth, Motto and Kenfield, Decision will be entered for the petitioners. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. At trial the petitioner testified that his contract with Chusid had expired by the time he secured employment with Pitney-Bowes. Although we were not informed of the date at which employment was commenced, we note that the contract of May 18, 1966, would by its terms expire on January 18, 1967. It, therefore, appears that the petitioner was confused as to whether the contract was still in force when he joined Pitney-Bowes because he was employed there in the fall of 1966.↩
3. The total amount petitioner paid to Chusid and Executive Advertising Service was $2,651.23. This amount was simply rounded off on petitioner's tax return.↩
4. Each of the above-mentioned cases as well as the instant one also involve the deductibility of certain out-of-pocket expenditures; e. g., printing and mailing costs.↩
5. Indeed, as we have stated in our findings of fact petitioner remained in the same trade or business after leaving Pitney-Bowes.↩
6. The degree of assistance that Chusid provided was not entirely free of doubt. The petitioner in a letter addressed to the district director of internal revenue at Cincinnati, Ohio, dated January 16, 1968, stated, "[they] [Chusid] were of no value to me * * *." For purposes of our findings of fact we chose to disregard this statement. The context within which it was made indicates that petitioner, due to his lack of expertise in tax matters, felt that he was furthering his cause. We found that objective manifestations of Chusid's actions were more reliable than the petitioner's subjective opinion. Moreover, at trial the petitioner's testimony did indicate that Chusid's efforts played a significant part in securing the Pitney-Bowes' offer.↩